IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ATM EXPRESS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:04CV990-M |
| | ) | [WO] |
| CITY OF MONTGOMERY, | ) | |
| ALABAMA,   a political subdivision | ) | |
| of the State of Alabama, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER ON MOTION**

In this civil action, the plaintiff, ATM EXPRESS, INC. ["ATM"], challenges the constitutionality of the business licensing ordinance enforced by the City of Montgomery, Alabama ["City"] on its face and as applied. ATM invokes this court's jurisdiction pursuant to 28 U.S.C. §§1331,[1] 1343(4),[2] 2201,[3] and 2202; it seeks declaratory and injunctive relief, damages, attorney fees and other supplemental relief because of the City's denial of a business license to operate an adult bookstore and videostore in Montgomery.

This suit is brought pursuant to 42 U.S.C. § 1983, in support of ATM's claims that the City's denial of a business license to operate the store violates its rights under the First and Fourteenth Amendments to the United States Constitution. ATM's challenge is two-fold: It

---

[1]    Federal questions arising under the U.S. Constitution.

[2]    Recover of damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights.

[3]    Declaration of rights and other legal relations.

attacks the ordinance on its face, alleging that the municipal statute "is a mode of censorship, regulation and control of certain specific kinds of speech" (Doc. # 1).   It further alleges that, because the City exacts requirements from license applicants for "adult" businesses that are not required of "mainstream (non-adult) video stores", the ordinance is also unconstitutional as applied.

The issues are currently before the court on the following motions:

1.      ATM's Motion For Partial Summary Judgment, filed on 1 December 2004 (Doc. # 20);[4] and

2.      The City's Motion for Summary Judgment, filed on 3 December 2004 (Doc. # 23).[5]

For the reasons set forth in this Memorandum, the court concludes that ATM's Motion For Partial Summary Judgment should be granted in part and denied in part, and the City's Motion For Summary Judgment should be denied.

## I.      FACTS AND PROCEDURAL HISTORY

Pursuant to the court's order, the parties submitted a Joint Statement of Stipulated Facts

---

[4]       ATM seeks partial summary judgment and the issuance of a permanent injunction, restraining the City from enforcing the license requirement.  It has requested the court to issue an order declaring the ordinance unconstitutional, reserving for a later trial the issue of damages, based upon its lost profits and attorney fees (Doc. # 21).

[5]       The City seeks summary judgment declaring that ATM lacks standing to challenge the ordinance and that the ordinance is constitutional.  The City's positions in response to ATM's motion, however, are inconsistent, as more fully discussed in this Memorandum.

on 1 December 2004 (Doc. # 19).

ATM's store, known as "X-Mart Adult Supercenter", is located on the Birmingham highway in Montgomery.  ATM wishes to sell "videotapes and DVD's which feature adults engaged in various explicit sexual activities," as well as "magazines which include similar content".  ATM also plans to sell "a variety of lingerie, 'adult novelties', 'marital aids' and other products of interest to adults" (Doc. # 1, Doc. # 19, ¶¶ 3, 4).  The store would have been the third of its kind in Montgomery (Doc. # 19, ¶10), but ATM does not operate the other stores.

On 23 September 2004, ATM applied for a standard business license but was told by the city's Director of Finance ["Director"],[6] who administers Montgomery's business license regulations, that the application could not be processed until ATM's principal consented to a criminal background check (Doc. # 19, ¶ 23).  The Director also required ATM to describe whether the content of the material to be leased and sold would be considered "hard core" or "soft core" pornography (Doc. # 19, ¶ 23).  ATM's legal counsel drafted a letter to the Director objecting to the additional requirements on First Amendment grounds (Doc. # 19, ¶ 26; Doc. # 1, Pl's. Ex. A).  ATM opened its store for business without having complied with the additional requests or obtained a business license (Doc. # 19, ¶ 27).

ATM provided the Director with the requested consent and content description on 24 September 2004 (Doc. # 19, ¶ 28).  The narrative stated, in pertinent part, as follows:

---

[6]    Carolyn Mozingo, a revenue administrator, was acting on the Director's behalf.  (Doc. # 19, ¶ 23).

3

This business is best characterized as an "adult videostore". The primary sales/rentals will consist of videotapes and DVDs with a sexually explicit content. Your application process apparently calls for a description of the content of these films - in particular, whether the films are "hard core" or "soft core" pornography. Those terms are not recognized in the industry and we do not believe they have any commonly accepted meaning. For instance, the commercial distributors of these films merely rate them as "X" and do not notify retailers whether they are "hard core" or "soft core".

These films are limited to adults only. Persons under the age of 18 will not be permitted in the store. None of the films to be sold or rented are obscene under contemporary community standards. While many of the films depict actual sexual activities, those activities are not themselves obscene and, when viewed in context, have serious literary, artistic, political or scientific value. We believe that these films are comparable to those already being sold in Montgomery.[7]

On 29 September 2004, the City notified ATM that the City Council would consider the matter at a hearing scheduled for 5 October. (Doc. # 19, ¶ 29). On the day before the scheduled meeting, City police officers, citing the failure to obtain the necessary business license, ordered ATM to shut down. (Doc. # 19, ¶ 30).[8] At the hearing the next day, after being

---

[7]    It is undisputed that ATM had no intention of presenting live entertainment, operating a bar, or selling alcoholic beverages (Doc. # 19, ¶6).

[8]    ATM states that it closed the store for fear that its staff would be arrested otherwise. (Doc. # 20, p. 6). In support of ATM's motion, ATM's president and director, Evgueni Souliaguine ["Souliaguine"], provided an affidavit in which he stated that the police threatened to arrest the store manager. (Doc. # 22, ¶ 7). The alleged threat, which Souliaguine did not personally hear, constitutes inadmissible hearsay within hearsay, and the court will not consider Souliaguine's statement as evidence that such threats were actually made. *See* FED. R. CIV. P. 56(e); FED. R. EVID. 801, 802; ***Macuba v. Deboer***, 193 F.3d 1316, 1322 (11th Cir. 1999). However, the court will consider the statement as evidence of Souliaguine's reasons for not reopening the store. *See, e.g.*, ***Rinehimer v. Cemcolift, Inc.***, 292 F.3d 375, 383 (3d Cir. 2002) (admitting an out of court statement offered not to prove the truth of the matter asserted but to explain the reasons for the

advised by the City's attorney that it was improper to open a business without a license, the City Council voted to deny ATM's business license.  (Doc. # 19, ¶¶ 33-34).

ATM then filed a civil complaint seeking to enjoin enforcement of City of Montgomery License Ordinance 48-91 ["48-91"], which ATM cited as the statutory premise of the city's denial of the business license (Doc. # 1, ¶ 49), on the ground that the ordinance violates the First Amendment on its face and as applied (Doc. # 1).

Following ATM's filing of a Motion For Preliminary Injunction on 15 October 2004 (Doc. # 2), the court, at both counsels' request, conducted a telephone status conference on 10 November 2004.  During the conference, counsel for ATM and the City encouraged the court to schedule the case non-traditionally, i.e., outside the routine scope of Rule 16 because, in their opinion, the case was resolvable by reference to the application of law.  **FED. R. CIV. P. 16.**  Counsel also indicated that both parties were willing to submit the disposition of the case to summary judgment without resort to the usual discovery process.  Thereafter, the court entered an order scheduling the parties' motions (Doc. # 15).

Thus, on 1 December 2004, ATM filed its Motion For Partial Summary Judgment (Doc. # 20), along with its memorandum in support (Doc. # 21).   The City filed its response to the motion on 8 December 2004 (Doc. # 25), five days after it filed its own Motion For Summary Judgment (Doc. # 23).

---

actions of a party who heard the statement); *U.S. v. Horsman*, 114 F.3d 822, 825-26 (8th Cir. 1997) (same); *Callon Petroleum Co. v. Big Chief Drilling Co.*, 548 F.2d 1174, 1177 n.3 (11th Cir. 1977).

ATM operated its store for less than 15 days (See Doc. # 16) and has not reopened the store since 4 October 2004.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law". **FED. R. CIV. P. 56(c);** *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95,111(2004).    A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Green v. Pittsburgh Plate and Glass Co*., 224 F. Supp. 2d 1348, 1352 (N.D. Ala. 2002) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).    "A judge's guide is the same standard necessary to direct a verdict: 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law'." *Id*. at 259.    "Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore, the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Id*. at 255.

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party.[9]    *Adickes v.*

---

[9]        The Supreme Court explained that:

*S.H. Kress & Co.*, 398 U.S. 144, 158 (1970); *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).   Notwithstanding this advantage, the nonmoving party bears the burden of coming forth with sufficient evidence on each element that must be proved.   *Earley v. Champion Intern. Corp*., 907 F.2d 1077, 1080 (11th Cir. 1990); *see Celotex*, 477 U.S. at 322-23.   When faced with a properly supported motion for summary judgment, a plaintiff must "go beyond the pleadings and ... designate 'specific facts showing that there is a genuine issue for trial.'"   *Celotex Corp.*, 477 U.S. at 324.   Although the evidence need not be in a form necessary for admission at trial, *id.*, unsupported, self-serving allegations are insufficient to oppose a motion for summary judgment.   *Harris v. Ostrout*, 65 F.3d 912 (11th Cir. 1995); *Fullman v. Graddick*, 739 F.2d 553, 556-57 (11th Cir. 1984).

By stipulation, the parties have agreed that there is no genuine issue of material fact in this case and that the issues before the court are "resolvable by reference to applicable law" (See Doc. #15).   They further agree that, pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment may be entered for either party based upon the court's analysis, without further evidentiary submissions.   The parties' agreement on the material facts has

---

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citations omitted).

7

substantially facilitated the court's analysis of, and decision regarding, the propriety of summary judgment in this case.

# III.   ANALYSIS

*A.*   ***The Parties' Contentions Regarding The Ordinance***[10]

## 1.   The General Text of the Ordinance

Ordinance 48-91 is a general enactment adopted by the Montgomery City Council on 29 October 1991. It establishes a "license fee" for, ***inter alia***, "[p]racticing, engaging in, carrying on or conducting any exhibition, trade, vocation, occupation, or profession in the City of Montgomery, Alabama." 48-91 § 19C-1(a). All businesses seeking a license under 48-91 must:

- ❗ demonstrate compliance with all "zoning ordinances, building codes and other codes and ordinances of the City", § 19C-4, as well as the state's public health requirements, when applicable, § 19C-9;

- ❗ provide information relevant to the determination of the amount to be charged as a license fee when "the amount to be paid as privilege license tax depends upon the sales made, or receipts of business done, or any other fact or condition" the ordinance specifies, § 19C-7;

---

[10]   Although the parties filed cross-motions for summary judgment, the legal arguments in both motions are virtually identical, and the outcome of the court's decision on one motion dictates the outcome on the other motion. The court has therefore reviewed and analyzed the parties' submissions as constituting one motion.

8

!     for certain specified purposes, upon demand by the Director of Finance, allow an "inspection during business hours of all portions of his place or places of business", provide "by sworn statement, or otherwise, all information requested bearing on the character of business engaged in, the dollar amount of the business transacted, or other data," and "make available for inspection and examination" essentially all business records, § 19C-8;

!     display the license in a "conspicuous place in their business establishment", § 19C-17; and

!     notify the Director of address changes. § 19C-18.

The ordinance also provides for a "special" or "privilege" license ["privilege license"], which imposes additional requirements and limitations on businesses engaged in the sale or distribution of alcoholic beverages, § 19C-21(a), (b), as well as a variety of other businesses, including contractors, § 19C-21(c); "electric light companies, etc.", § 19C-21(d); "gas companies, etc. (Natural)", § 19C-21(e); "gasoline and oil companies, wholesale", § 19C-21(f); insurance companies, § 19C-21(g); businesses not permanently located in the City, § 19C-21(h); and telephone companies, § 19C-21(i).  Each business type and its corresponding, additional burdens are addressed individually.  *See generally* § 19C-21.

Ordinance 48-91 was clearly intended as a comprehensive enactment.  Although it was designed to regulate the transaction of all business within the City, its text is devoid of any references to its legislative history, or the imperatives, concerns, interests, or considerations

which brought it into being.

Nor is it officially annotated in any way  - thus, the regulated industries, the ordinary citizen, and even subsequently elected members of the City Council cannot discern from its text any impetus for the legislation based upon findings, studies, surveys, or actual experience. The first entry in the index of the ordinance is "Purpose and Coverage", but the pertinent text yields no indication of either the reasons for its passage or the objectives it seeks to achieve.

These factors are germane to the court's consideration of "community standards criteria", discussed *infra*.


2.      **The Challenged Text of the Ordinance**

ATM's complaint addresses none of the aforementioned aspects specifically.   Instead, its focus is limited to two discrete provisions.

The first is a catchall provision for a "license based on community standards criteria":

> Any license determined to be based on community standards
> criteria will require City Council approval before issuance.

§ 19C-21(j) (Docs. # 1, 20).   The ordinance provides no definition for "community standards". Moreover, it does not set forth any specific "community standards criteria" or any factors germane to the determination thereof.   *See generally* 48-91; *see also* § 19C-3 (defining terms).

Although the ordinance clearly requires a license to do business,[11] it does not identify the person(s) responsible for determining whether a particular business must obtain such a license based on "community standards criteria".  It is also true that "[t]he City has not adopted written guidelines for establishing whether a particular business is subject to the 'community standards criteria' and hence required to obtain City Council approval before issuance of a license" (Doc. # 19, ¶ 20).  In practice, the task of evaluating applicants to determine if they should be referred to the City Council has been assumed by the City's Director of Finance, who is charged generally with administering the ordinance.[12]   In fact, if the Director determines, for any unspecified reasons (none of which have to be divulged),  that the applicant does not require a license based on "community standards criteria", he issues the license without any participation by the City Council (Doc. # 19, ¶ 17). ATM contends that section 19C-21(j) renders 48-91 unconstitutional.

The second provision that ATM attacks is section 19C-27, on the basis that it intolerably intrudes upon liberties protected by the First Amendment.  Section 19C-27 states

---

[11]     The ordinance makes it "unlawful for any person to engage in or carry on any business or to do any act within the corporate limits of the City for which a license is required by this ordinance without first having taken out such license as herein provided."  *See* § 19C-5.  As a specific remedy for violations of that requirement, new businesses that fail to "pay the prescribed license fee within fifteen (15) days of commencement of operations are subject to a 10% penalty of the amount placed on deposit for the beginning year's operations, plus one percent (1%) interest for each subsequent month of delinquency".  *See* § 19C-20a.

[12]     *See, e.g.*, §§ 19C-6 (requiring the Director to keep records of licensees); 19C-7 (requiring licensees to provide information to the Director); 19C-8 (empowering the Director to inspect and audit licensees); 19C-27 (authorizing the Director to "investigate into all applications for licenses")

11

in relevant part:

> The City Director of Finance shall have the authority to investigate into all applications for licenses, and *if in his opinion such shall be necessary or desirable*, he *may* refer such application to the City Council for a determination on whether such license shall be issued.  If said Council decides to deny the issuance of any license referred to it, the City Clerk shall immediately so notify the license applicant.  If said applicant desires to appear before the Council to show cause why said license should be issued, he shall file a written notice with the City Clerk within two weeks from the date of mailing of said notice by the City Clerk.  Immediately upon receipt of said notice from the applicant, the City Clerk shall schedule a hearing, *to be held* within 15 days from date [sic] of receipt of such notice, before the City Council, with notice of such hearing being furnished applicant [sic].   The applicant shall be given the opportunity to appear personally, or through counsel, or both, and the City Council shall proceed to hear any evidence which may be presented both for and against the issuance of said license.  If the Council determines from the evidence presented that in order to either *provide for the safety, preserve the health, promote the prosperity or improve the morals, order, comfort, and convenience of the inhabitants of the City* said license shall not be granted, it shall enter an order to that effect; otherwise, said license shall be ordered issued upon payment of any required license fees. . . .

§ 19C-27 (emphasis added).

ATM contends that, because "the ordinance allows licensing decisions to be made in the unfettered discretion of permitting officials" (Doc. # 21, p. 13), it imposes an unconstitutional prior restraint on activities protected by the First Amendment.   ATM also contends that portions of the ordinance are unconstitutionally vague, including "the initial determination of which businesses are subject to mandatory review by the City Council and the arbitrary 'standards' by which license applications are to be considered" (Doc. # 20, ¶ D).

Finally, ATM argues that the statute is unconstitutionally broad because "the application of the 'community standards criteria' potentially subjects mainstream businesses to the burdensome licensing process nominally reserved for adult businesses" (Doc. # 20, ¶ E).

### 3.      The City's Contentions

The City of Montgomery has filed two pleadings which are, at best, inconsistent, and which, when considered together, strongly suggest a concession to some of ATM's arguments.

### a.      The City's Motion For Summary Judgment

The City filed its own motion for summary judgment (Doc. # 23), requesting an order declaring that ATM does not have standing to challenge the ordinance because it unlawfully operated its business without a license "in violation of . . . .§ 19C-5 of the ordinance," MONTGOMERY, ALA. CODE §1-6,[13] and ALA. CODE §11-51-93.[14]   Alternatively, the City urges

---

[13]      This section of the city code provides for a "general penalty" and "continuing violations":

Whenever in this Code, in any ordinance of the city or in any rule or regulation promulgated by any officer or agency of the city under authority vested in him or it by law or ordinance, any act is prohibited or is declared to be unlawful, or the doing of any act is required, or the failure to do any act is declared to be unlawful, and no specific penalty is provided therefor, the violation of any such provision of this Code or any such ordinance, rule or regulation shall be punished by a fine of not less than one dollar nor more than five hundred dollars, or by imprisonment in jail or at hard labor for a period not exceeding six months, or by both such fine and imprisonment, at the discretion of the judge of the municipal court.  Each day any violation of this Code or any such ordinance, rule or regulation continues shall constitute a separate offense.

[14]      The state statute   - apparently an umbrella provision -   includes similar prohibitions:

It shall be unlawful for any person, firm, or corporation, or agent of a

13

the court to find that the ordinance is not unconstitutional on its face or as applied.

In its attempt to synthesize the City's response to ATM's claims, the court emphatically notes that the City's memorandum of law in support of its motion for summary judgment was devoted chiefly to a discussion of the standing issue (see Doc. # 24).   The City failed to discuss or analyze ATM's First Amendment challenge and cited no legal authorities in support of its argument that the ordinance is constitutional.

> b.      *The City's Response to ATM's Motion For Summary Judgment*

Although the city persisted, in its response to ATM's dispositive motion, in arguing that the plaintiff lacks standing to challenge the ordinance, the City acknowledged, through its attorney, that the ordinance lacks clarity, and that at least the attorney  - if not the City Council itself -

> is clearly desirous of amending the [ordinance] to establish clearer standards, e.g., the definition of such terms as "contemporary community standards," "community standards criteria" and the like.

The City contends that those terms *are* defined in contexts beyond the text of the ordinance itself, suggesting that the external definitions are, for purposes of resolving the issues in this

---

firm or corporation to engage in business or vocations in a city or town for which a license may be required without first having procured a license therefor.

The state statute sets forth the same penalties as the local ordinance.

case, applicable *and* sufficient.[15]

In any case, the court must consider the City's insistence on the constitutional validity of the statute alongside its acknowledgment that the text of the ordinance evinces a "need for amendment" that "is apparent for many reasons" (Doc. # 27, p. 2). That the City has not elucidated those "reasons" for the court may not invalidate the ordinance, but it arguably sanctions exploration of its integrity beyond the summary disposition the City encourages.


**B.     Jurisdiction, Venue, and State Action**

The court finds that its jurisdiction has been properly invoked and that venue appropriately lies in this district. The parties stipulate that the court has jurisdiction over the subject matter and the parties and that venue is proper (Doc. # 19, ¶ 2).

ATM's assertion of Section 1983 as a statutory vehicle for challenging the constitutionality of the ordinance is also valid. Section 1983 authorizes the court to redress "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" committed by any "person" who acts "under color of any statute, ordinance, regulation, custom, or usage, of any State". 42 U.S.C. §1983. Thus, ATM may establish personal liability by showing "that the official, acting under color of state law, caused the deprivation of a federal right". *Kentucky v. Graham,* 473 U.S. 159, 166 (1985).

In any case, the parties have stipulated that "[t]he City . . . is amenable to suit under 42

---

[15]      Notably, the City did not provide even the external definitions.

U.S.C. §1983" (Doc. # 19, ¶1).


C.      **ATM's Standing**

ATM offers two theories supporting its standing to challenge the constitutionality of

48-91.  First, ATM states that it

> actually applied for its business license, it actually appeared
> before the City Council and it actually suffered a denial of its
> application.   In other words, the License Ordinance at issue was
> actually applied against the Plaintiff and used as a means of
> denying the Plaintiff the opportunity to engage in free speech.

(Doc. # 21, p. 2).   Second, ATM argues that whether it applied for a license is irrelevant, as

traditional standing requirements do not apply to facial constitutional challenges when the

plaintiff is subject to the statute's provisions (Doc. # 21, pp. 4-6).

In response, the City argues that denial of ATM's application does not confer standing

because the Council's decision was based on ATM's violation of the law, namely operating a

business without a license   (Doc. # 25, pp. 5-7).   Thus, ATM has unclean hands and cannot,

consequently, assert a deprivation of rights resulting directly from its own wrongdoing.   *Id.*

By violating the law, ATM "lost its standing to challenge the City's license ordinance."   (Doc.

# 25, p. 6).   Alternatively, the City argues that the doctrine creating limited exceptions to the

traditional standing requirements does not apply in these circumstances.


1.    **Constitutional Requirements for Standing**

Article III of the U.S. Constitution confers jurisdiction upon the federal courts to hear

"cases" or "controversies", terms defined to require a plaintiff to demonstrate that

- "it has sustained an injury of a legally protected interest;"

- "a causal connection [exists] between the injury and the conduct complained of;" and

- "the injury is capable of being redressed by the court."

*See*, *e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Café Erotica of Florida, Inc. v. St. John's County*, 360 F.3d 1274, 1281 (11th Cir. 2004); *see also* *Women's Emergency Network v. Bush*, 323 F.3d 937, 943 (11th Cir. 2003).

> "[E]ach element of standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.'" *Florida Public Interest Research Group v. EPA*, 386 F.3d 1070, 1083 (11th Cir.2004) **(quoting *Bischoff* [*v. Osceola County, Fla.*] ,** 222 F.3d [874,] 878 [(11th Cir. 2000)] (internal quotation marks omitted) (quoting *Lujan*[], 504 U.S. [at] 561)). Accordingly, when a question about standing is raised at the motion to dismiss stage, "it may be sufficient to provide 'general factual allegations of injury resulting from the defendant's conduct.'" *Id.* (quoting *Bischoff*, 222 F.3d at 878). In contrast, when, as here, standing is raised at the summary judgment stage, "the plaintiff can no longer rest on 'mere allegations.'" *Id.* (quoting *Bischoff*, 222 F.3d at 878 (internal quotation marks omitted) (quoting *Lujan* 504 U.S. at 561)).

*Bochese v. Town of Ponce Inlet*, 04-11542, 2005 WL 779314, at ____(11th Cir. Apr. 7, 2005).  Thus, a plaintiff must identify specific facts supporting each element.

        a.       *Injury in fact*

The Supreme Court has defined "injury in fact" as "an invasion of a legally protected interest which is both "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical'". *Lujan*, 504 U.S. at 560.   Undisputed evidence and the applicable law establish that ATM was deprived of the ability to engage legally in the business of selling constitutionally protected speech.[16]      *Roaden   v.   Kentucky*, 413  U.S.  496,  504  (1973) (describing adult oriented materials as "arguably within First Amendment protection" and thus "presumptively" protected).

ATM's attempts to secure a license were first impeded by the Director, who refused to consider the application until ATM provided additional information that was not required of most other types of retail businesses (Doc. # 19, ¶¶ 21-25).   The delay was further prolonged when the Director determined, for unstated reasons, that the application required Council approval.   (Doc. # 19, ¶ 29).   In obvious protest,[17] ATM opened and operated its business prior to the Council's decision, until the police ordered ATM to cease.   ATM complied with the order.   (Doc. # 19, ¶¶ 30-31).   By closing the business and terminating its sales, ATM was unquestionably deprived of its First Amendment rights, and this deprivation was concrete, particularized and actual.   The City's argument focuses upon the cause of the deprivation, to which the court now turns.

---

[16]      "[T]he degree of First Amendment protection is not diminished merely because the newspaper or speech is sold rather than given away."  *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 756 n.5 (1988) (citing *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 385 (1973)).

[17]      While the court acknowledges ATM's protest, the court makes no findings regarding the propriety of ATM's response to actions it viewed as dilatory and/or unfair.

b.    *Causation*

To satisfy the causation requirement, a plaintiff must demonstrate that the injury complained of is fairly traceable to the action complained of.  *See*, *e.g.*, **Charles H. Wesley Educ. Found., Inc., v. Cox**, 04-01780, 2005 WL 1121981, at ____ (11th Cir. May 12, 2005) [herinafter "**Educ. Found**."];  **Koziara v. City of Casselberry**, 392 F.3d 1302, 1304 (11th Cir. 2004); **Parker v. Scrap Metal Processors, Inc.**, 386 F.3d 993, 1003 (11th Cir. 2004).

Focusing entirely on the fact that the City Council ultimately refused to issue a business license to ATM, the City contends that the plaintiff lacks standing to challenge the statute because its injury was the result of its failure to comply with the very statute it challenges.[18] If the injury that ATM sustained were caused solely by the Council's decision, the City's argument would be more persuasive.  In other words, if ATM had simply chosen  to operate a business without first seeking a license, then ATM's injuries would be fairly traceable exclusively to the provision outlawing operation of a business without a license, which applies equally to all non-compliant business owners.[19]

---

[18]    *See* exhibits to the City's Memorandum of Law in opposition to ATM's Motion For Partial Summary Judgment, i.e., affidavits from each member of the City Council which state, *inter alia*, that the vote to deny ATM's license was cast "solely on the basis of its unlawful engaging and operating its business without a business license" (Doc. # 27).

[19]    However, **Education Foundation** suggests that even when the prohibition itself is challenged, an argument that a plaintiff's injuries resulted solely from the enforcement of the challenged prohibition will not defeat standing.

> [W]e reject the claim that because the [plaintiff] engaged in actions Defendants consider prohibited, the Plaintiffs are the "cause" of any injuries suffered.  Whether [the Defendant's] denial was appropriate, and whether

However, that is not what happened in this case.  ATM has provided evidence that its injury resulted as well from provisions which, in practice, authorize the Director to delay the issuance of a license to sell material protected by the First Amendment based solely on the material's content, or the Director's non-standardized conclusions about the content.[20]

Another plausible interpretation of the City's argument would require the Court to assume the constitutionality of the allegedly unconstitutional provisions.    Thus, the City "conflates standing with the merits of the case."  *Educ. Found.*, 2005 WL 1121981, at \_\_\_\_ ("Causation in the standing context is a question of fact unrelated to an action's propriety as a matter of law.").    ATM's injury is clearly traceable to the operation of the challenged

---

> Plaintiffs acted within their rights in conducting their [voter registration] drive as they did, are questions relevant not to standing, but to the dispute on the merits (so long as Plaintiffs' asserted *interests* are legally protected).

2005 WL 1121981, at \_\_\_\_ .  In this case, although ATM advocates invalidating the entire licensing ordinance, it does not challenge the constitutionality of a law proscribing the operation of a business without a license.

[20]    "The City requires a criminal background check for adult bookstores, adult movie houses [and] adult video stores".  (Doc. # 19, ¶ 24).  "The City also requires a disclosure of *content* for adult bookstores, adult movie houses [and] adult video stores . . ...."  (Doc. # 19, ¶ 25) (emphasis added).  Whereas the City may have entirely different reasons for imposing these additional requirements on the few other types of businesses to which the City refers, content offers the only possible explanation for requiring such information from would-be licensees of sexually oriented, or "adult", businesses distributing literature and films.  It does not matter that the information may be necessary to ensure compliance with other statutes, as the City suggests.  (Doc. # 23, pp. 8-11).  While that may be important for determining whether the content-based requirements are constitutional, it is irrelevant for purposes of determining whether the requirements are in fact content based.  In any case, regardless of any one Director's specific intentions, § 19C-27 unquestionably permits the Director to "refer [an] application to the City Council for a determination of whether [the] license shall be issued" based solely on "his opinion [that] such shall be necessary or desirable".

provisions.   Even the City admits that it would not consider ATM's application until it complied with administrative demands for additional information (Doc. # 19, ¶ 23).

The City's assignment to ATM of responsibility for the denial of the license is also suspect for another reason   -   one that is beyond the analytical framework structured by the Supreme Court, yet germane to the particulars of this case.   The City, on its own and through the members of the City Council, insists that ATM's operation without a license is the sole cause for the denial.

In fact, although 48-91 requires businesses to secure licenses to operate within the city (§ 19C-2, 3, 4), and although it prohibits businesses from operating without a license (§ 19C-5), the penalties in 48-91 for violating the ordinance do not include denial of a license. Instead, in § 19C-20 of the ordinance, the penalties are limited to monetary assessments and referrals to the municipal court for criminal prosecution,[21] consistent with the penalties set forth in MONTGOMERY, ALA., CODE §1-6 and in ALA. CODE §11-51-93 (See notes 13 and 14, *supra*).

Thus, while the City could certainly have preferred criminal charges against ATM for operating without a license, there is no statutory support for denial of licensure as punishment for operating without a license.[22]   These findings do not necessarily negate the council

---

[21]    The language in § 19C-20 specifically mentions "conviction" and refers to ALA. CODE §11-51-93, the state statute which criminalizes conducting business without a license.

[22]    A fair interpretation of the penalties in § 19C-20 suggests that the goal of the penalties is to *encourage* businesses to *continue* to operate, upon payment of the surcharges, not to *terminate or close* the offending businesses.

members' subjective reasons for denying ATM's license; they do, however, ratify the court's evaluation of causation for purposes of determining standing.

### c.    *Redress of injury*

Finally, ATM must demonstrate a "substantial likelihood" that a victory would redress its injury, i.e., would a judicial finding in ATM's favor permit it to conduct business in Montgomery?  *See*, *e.g.*, ***Simon v. E. Ky. Welfare Rights***, 426 U.S. 26, 45-46 (1976); ***Vt. Agency of Natural Res. v. U.S. ex rel. Stevens***, 529 U.S. 765, 771 (2000).

Two reasons loom as conclusive evidence that ATM's injury can be redressed, because ATM merely desires a license to do business in Montgomery.  First, this court's declaration that 48-91 is unconstitutional on its face or was unconstitutionally applied to ATM would enable ATM to secure a license by paying a fee computed pursuant to §§ 19C-12, 19C-13, and the appropriate license schedule.  In other words, it would no longer be necessary to navigate the administrative route dictated by   - though not defined by -   "community standards criteria".[23]  Second, as the court discusses more fully, ***infra,*** the City is prepared, even in the absence of an injunction, to issue a license to ATM upon its re-application for one (Doc. # 23, p. 4).

### 2.    **Standing to Challenge 48-91 on Its Face**

---

[23]        At least not the *current* route.

22

Once the court resolves jurisdictional issues in a First Amendment challenge, the court must then determine whether the ordinance is content neutral.  This issue is addressed in the context of standing in this case, however, because whether ATM has standing to challenge the ordinance on its face necessarily requires a determination of whether the statute is content- or viewpoint-based or specifically and narrowly addresses an activity or conduct commonly associated with speech.

In order for the court to determine whether ATM has standing to challenge 48-91 on its face, the court must first decide whether 48-91 is susceptible to such an attack.  It is not.

> "A facial challenge, as distinguished from an as-applied challenge, seeks to invalidate a statute or regulation itself." *United States v. Frandsen*, 212 F.3d 1231, 1235 (11th Cir. 2000).  The general rule is that for a facial challenge to a legislative enactment to succeed, "the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 . . . (1987).  "The fact that [a legislative act] might operate under some conceivable set of circumstances is insufficient to render it wholly invalid . . . ." *Id.*  This "heavy burden" makes such an attack "the most difficult challenge to mount successfully" against an enactment. *Id.*

*Horton v. City of St. Augustine, Fla.*, 272 F.3d 1318, 1329 (11th Cir. 2001) (concluding that an ordinance prohibiting street performances in a section of the city was not unconstitutionally vague) (emphasis added).

In essence, a party challenging a statute on its face asserts the rights of all those to whom the statute might conceivably apply, although the challenger may in fact lack sufficient interest to ensure that those rights are zealously defended.  ***Elk Grove Unified Sch. District***

*v. Newdow*, 542 U.S. 1, ___ n.7 (2004); *City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999); *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 981 (11th Cir. 2005) ("The focus of the standing inquiry is whether the plaintiff is the proper party to bring this suit.").

The inherent risk accompanying such challenges - that the challenger is not the best litigant - has led the courts to deny facial challenges in most circumstances, carving out only a few narrow exceptions, one of which arises in the context of the First Amendment. *Los Angeles Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39 (1999) [hereinafter "*LAPD*"] (discussing the exceptions to the general rule disfavoring facial challenges and holding that a statute limiting access to arrestee information was not subject to a facial challenge).

In *LAPD*, the Ninth Circuit had determined that a statute that imposed restrictions on commercial access to arrestee information was facially unconstitutional because it drew distinctions that were irrelevant to the alleged privacy interests the statute was aimed to protect. *LAPD*, 528 U.S. at 37. The Supreme Court reversed, noting that "what we have before us is nothing more than a governmental denial of access to information in [the government's] possession", and holding that such statutes did not fall within any exceptions to the rule against facial challenges. *Id.* at 40-41.

A fair reading of *LAPD* suggests that the proper focus should be the direct consequences of the statute. *Id.* "[Plaintiff's] claim does not fit within the case law allowing courts to entertain facial challenges. No threat of prosecution, for example, see *Gooding [v.*

*Wilson*, 405 U.S. 518 (1972)], or cutoff of funds, see *Nat'l Endowment for Arts [v. Finley*, 524 U.S. 569 (1998)], hangs over their [sic] heads." *Id.*[24]  The only other exception    - one it referred to as the "prototypical exception[] to th[e] traditional rule" -    involves challenges to statutes that "regulate or proscribe" speech. *Id.* at 38.

Ten years prior to *LAPD*, the Court had addressed such a statute, and its opinion established the very limited circumstances in which a licensing ordinance is subject to a facial attack.  *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988) [hereinafter "*Lakewood*"]; *see also Café Erotica of Fla., Inc. v. St. Johns County*, 360 F.3d 1274, 1281 (11th Cir. 2004) (citing *Lakewood* for the proposition that it had jurisdiction to entertain a facial attack on a licensing law because the ordinance "creates a realistic danger that the statute itself will significantly compromise recognized First Amendment protections"); *Abramson v. Gonzalez*, 949 F.2d 1567, 1573 (11th Cir. 1992) (citing *Lakewood* as well as other cases cited therein, 486 U.S. at 756 n.6, as creating an exception to the general rule regarding facial constitutional challenges); *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989) (describing *Lakewood* as having established a "narrow class of permissible facial challenges to allegedly unconstrained grants of regulatory authority").

Addressing a municipal ordinance that granted the mayor unfettered discretion to deny

---

[24]     Elsewhere, the court cited to two other cases establishing exceptions.  *LAPD*, 528 U.S. at 39 (citing *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725 (1997) (allowing a facial challenge to a local redevelopment plan under the takings clause of the Fifth Amendment); *Anderson v. Edwards*, 514 U.S. 143 (1995) (addressing facial challenge to "state regulation restructuring the disbursal of welfare benefits")).

25

a license to place newsracks on public sidewalks, the *Lakewood* Court first noted the risks associated with such "unbridled licensing schemes." *Lakewood*, 486 U.S. at 755-59.[25]   The Court stated that such statutes chill speech by encouraging self-censorship and obstruct judicial review by failing to provide "standards by which to measure the licensor's action." *Id.* at 759.   "It is when statutes threaten these risks *to a significant degree* that courts must entertain an immediate facial attack on the law." *Id.* (emphasis added).

Quoting *Lakewood***,** ATM asserts that "a facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *Id.* (Doc. # 21, p. 2).   While accurately quoted, *Lakewood* impedes, more than it boosts, ATM's position.   As the Court continued, "This is not to say that the press or a speaker may challenge as censorship any law involving discretion to which it is subject.   *The law must have a close enough nexus to expression*, *or to conduct commonly associated with expression*, to pose a real and

---

[25]
> That ordinance gives the mayor the authority to grant or deny applications for annual newsrack permits.   If the mayor denies an application, he is required to "stat[e] the reasons for such denial." In the event the mayor grants an application, the city issues an annual permit subject to several terms and conditions.   Among them are: (1) approval of the newsrack design by the city's Architectural Board of Review; (2) an agreement by the newsrack owner to indemnify the city against any liability arising from the newsrack, guaranteed by a $100,000 insurance policy to that effect; and (3) any "other terms and conditions deemed necessary and reasonable by the Mayor."

> *Lakewood*, 486 U.S. at 753.

substantial threat of the identified censorship risks."   *Lakewood*, 486 U.S. at 759 (emphasis added).

Crucial to the Court's holding was the fact that the ordinance was "directed narrowly and specifically at expression or conduct commonly associated with expression: the circulation of newspapers."   *Id.* at 760.   This characteristic was one of two "which, at least in combination, justify the allowance of a facial challenge."[26] *Id.* at 759.

> In contrast to the type of law at issue in this case, laws of general application that are not aimed at conduct commonly associated with expression and do not permit licensing determinations to be made on the basis of an ongoing expression or the words about to be spoken, carry with them little danger of censorship.   For example, a law requiring building permits is rarely effective as a means of censorship.   To be sure, on rare occasion an opportunity for censorship will exist, such as when an unpopular newspaper seeks to build a new plant.   But such laws provide too blunt a censorship instrument to warrant judicial intervention prior to an allegation of actual misuse.   And if such charges are made, the general application of the statute to areas unrelated to expression will provide the courts a yardstick with which to measure the licensor's occasional speech-related decision.

*Id.* at 760-61.

Unlike an ordinance specifically directed toward newsracks, nude dancing or adult bookstores (to which *Lakewood* more appropriately applies) 48-91 is a law "of general application," *id.*, that applies to all persons seeking to engage in commerce in Montgomery. Although it applies to businesses whose commercial aim is to sell speech, it applies as well

---

[26]   The other was the fact that the license had to be renewed annually.   *Lakewood*, 486 U.S. at 759.

to those whose commercial aim is to sell steel, sand, snake oil and soccer balls.  The ordinance not only establishes the circumstances under which business licenses for all manufacturers, professionals, retailers, service industries, transient dealers, and wholesalers will be distributed, it also provides for record keeping, compliance with state health requirements, computation of fees, agents and representatives of non-residents, and use of streets.  Its application is patently general, and there is a strong likelihood that most of the businesses licensed under its scheme are not identified by their distribution of spoken or written expression.

Moreover, the specific provision outlining a license based on "community standards criteria"  may be applied to every applicant, not solely to those engaged in activity protected by the First Amendment.  *See*, *e.g.*, ***Potts v. Bennett***, 487 So.2d 919 (Ala. Civ. App. 1985) (addressing a challenge to an administrative denial of an off-premises beer license based on "community standards", though not through application of 48-91); ***Mims v. Russell Petroleum Corp.***, 473 So.2d 507, 509 (Ala. Civ. App. 1985) ("Community standards, i.e., opposition to the location of retailers of intoxicants, also have a bearing on each case.  There is evidence in the present case that the mayor, city council, school board, other community leaders, and citizens are strongly opposed to this *particular* location . . .." (emphasis in original)).  In fact, ATM admits that "'community standards criteria' is nowhere defined in the Ordinance" and that the "Clerk and City Council" determine "which businesses involve 'community standards

28

criteria.'" (Doc. # 21, p. 7).[27]

Neither 48-91 as a whole nor the individual provisions therein are "directed narrowly and specifically at expression or conduct commonly associated with expression." *Lakewood*, 486 U.S. at 760.[28]     Therefore, it is not subject to a facial attack.

---

[27]   Preceding this admission, and on the same page, ATM stated that the license based on community standards itself established "a separate category for adult businesses". ATM's contention that "adult businesses are the only category for which a referral to the City Council is mandatory" is unsupported by the language of the ordinance, which does not specifically mention adult or sexually oriented business.  Moreover, it is disingenuous, on the one hand, to argue that the statute suffers because it does not define "community standards criteria" and, on the other hand, to contend that "community standards criteria" means "adult businesses" only.

[28]   All but one of the cases ATM cites that could arguably, if not marginally, support its position that 48-91 is subject to a facial attack are distinguishable on this point. *Contrast City of Littleton, Colo. v. Z.J. Gifts D-4, L.L.C.*, 514 U.S. 774 (2004) (ordinance specifically regulating sexually oriented businesses); *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) (statute addressing child pornography); *United States v. Playboy Entm't Group*, 529 U.S. 803 (2000) (statutory section addressing sexually explicit cable channels); *Reno v. Am. Civil Liberties Union*, 521 U.S. 844 (1997) (Communications Decency Act); *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123 (1992) (assembly and parade ordinance); *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990) (ordinance specifically regulating sexually oriented businesses); *Broadrick v. Oklahoma*, 413 U.S. 601 (1973) (statute restricting state employees' political activities); *Shuttlesworth v. Birmingham*, 394 U.S. 147 (1969) (ordinance requiring permit to participate in parade, procession or other public demonstration); *Freedman v. Maryland*, 380 U.S. 51 (1965) (motion picture censorship statute); *Bantam Books v. Sullivan*, 372 U.S. 58 (1963) (statute creating a commission whose purpose was to "educate the public concerning any book, picture, pamphlet, ballad, printed paper or other thing" deemed obscene); *Thornhill v. Alabama*, 310 U.S. 88 (1940) (anti-loitering and picketing statute); *Near v. Minnesota*, 283 U.S. 697 (1931) (statute classifying certain types of newspapers as public nuisances); *Zibtluda, LLC v. Gwinnett County, Ga. ex rel. Bd. of Comm'rs of Gwinnett County*, No. 03-15685, 2005 WL 1362711, at *3 (11th Cir. June 9, 2005) (ordinance applying specifically to adult entertainment businesses); *Bourgeois v. Peters*, 387 F.3d 1303 (11th Cir. 2004) (city policy requiring all persons wishing to participate in a protest to undergo magnetometer screening); *Burk v. Augusta-Richmond County*, 365 F.3d 1247 (11th Cir. 2004) (anti-protesting ordinance); *Granite State Outdoor Advertising, Inc. v. City of Clearwater*, 351 F.3d 1112 (11th Cir. 2003) (sign ordinance); *Granite State Outdoor Advertising, Inc. v. City of St.*

*Petersburg*, 348 F.3d 1278 (11th Cir. 2003) (sign ordinance); ***Fly Fish v. Cocoa Beach***, 337 F.3d 1301 (11th Cir. 2003) (ordinance applying specifically to adult entertainment businesses); ***Atlanta Journal & Constitution v. City of Atlanta Dep't of Aviation***, 322 F.3d 1298 (11th Cir. 2003) (plan governing sale of newspapers at airport); ***Giovani Carandola, Ltd. v. Bason***, 303 F.3d 507 (4th Cir. 2002) (statute specifically proscribing public nudity and any "entertainment that includes or simulates sexual intercourse"); ***Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville***, 274 F.3d 377, 398-99 (6th Cir. 2001) (ordinance specifically regulating sexually oriented businesses); ***Artistic Entm't, Inc. v. City of Warner Robins***, 223 F.3d 1306, 1310-11 (11th Cir. 2000) (ordinance and regulation applying specifically to adult entertainment businesses); ***Frandsen***, 212 F.3d 1231 (permitting requirement for "public expressions of views"); ***Boss Capital, Inc. v. City of Casselberry***, 187 F.3d 1251 (11th Cir. 1999) (ordinances applying specifically to adult entertainment businesses, *recognized as overruled in Zibtluda, LLC*, 2005 WL 1362711 at \*3) ; ***Lady J. Lingerie, Inc. v. City of Jacksonville***, 176 F.3d 1358, 1362 (11th Cir. 1999) (ordinances applying specifically to adult entertainment businesses); ***Redner v. Dean***, 29 F.3d 1495 (11th Cir. 1994) (ordinance applying specifically to adult entertainment businesses); ***Sentinel Comm. Co. v. Watts***, 936 F.2d 1189, 1197 (11th Cir. 1991) (newsrack ordinance); ***City of Paducah v. Investment Entm't, Inc.***, 791 F.2d 463 (6th Cir. 1986) (license revocation procedures established in an ordinance regulating "obscene films" and "obscene publications"); ***Miami Herald Pub'g Co. v. City of Hallandale***, 734 F.2d 666 (11th Cir. 1984) (newsrack ordinance); ***Gayety Theatres, Inc. v. City of Miami***, 719 F.2d 1550 (11th Cir. 1983) (ordinance  specifically providing for revocation of a business license for "exhibiting, showing, selling, lending, or transmitting any motion picture film(s), book(s), magazine(s), and video tape(s), or other material that has been found to be obscene, lewd, lascivious, filthy or indecent"); ***Osediacz v. City of Cranston ex rel. Rossi***, 2004 WL 2580179, \*11 (D. R.I. 2004) (outdoor decoration ordinance); ***Executive Arts Studio, Inc. v. City of Grand Rapids***, 227 F. Supp. 2d 731 (W.D. Mich. 2002) (zoning ordinance applying specifically to adult bookstores); ***Red-Eyed Jack, Inc. v. City of Daytona Beach***, 165 F. Supp. 2d 1322 (M.D. Fla. 2001) (zoning ordinance applying specifically to adult theaters); ***Fla. Cannabis Action Network, Inc., v. City of Jacksonville***, 130 F. Supp. 2d 1358 (M.D. Fla. 2001) (permitting a facial challenge to an ordinance requiring a "festival permit" after describing the ordinance as regulating the issuance of "permits that represent a necessary prerequisite to using public fora for disseminating certain types of protected expression"); ***T-Backs Club, Inc. v. Seaton***, 84 F. Supp. 2d 1317 (M.D. Ala. 2000) (addressing statutes and ordinances specifically directed to "adult bookstore[s]", "adult movie house[s]", "adult video store[s]" or "other form[s] of adult-only entertainment enterprise[s]" and public nudity); ***Fla. Video Xpress, Inc. v. Orange County, Fla.***, 983 F. Supp. 1091 (M.D. Fla. 1997) (ordinances applying specifically to adult entertainment businesses); ***Swearson v. Meyers***, 455 F. supp. 88, 91 (D. Kan. 1978) (ordinance regulating charitable solicitations) *with **Silver Spurs v. Palm Shores***, 1997 WL 809203 (M.D. Fla. 1997) (addressing a general occupational licensing ordinance and drawing

3.        **Standing to Challenge 48-91 as Applied**

The City contends that ATM lacks standing to mount an "as applied" challenge for two reasons:

1.        ATM violated the law by engaging in business without first obtaining a license; and

2.        "ATM's claims of an alleged infringement upon its First Amendment rights fall far short of carrying the burden of establishing that ATM has suffered 'an invasion of a legally protected interest . . . concrete and particularized.'"

(Doc. # 27, pp. 4-5, quoting ***T-Backs Club, Inc.***, 84 F. Supp. 2d at 1325 n.2).  The court disagrees.

The City's first argument can be interpreted to mean, generally, either that a person may not challenge the legality of a law he is accused of violating (the city frames the question as "whether ATM violated the law and lost its standing to challenge the . . . ordinance" (Doc. # 27, p. 6)) or that the City may deny a license to any person who first engages in business without a license, and such denial, objectively grounded, does not implicate the First Amendment.  Both interpretations fail.

Many challenges against statutes are mounted defensively.  *See*, *e.g.*, ***Cohen v. California***, 403 U.S. 15 (1971) (reversing the conviction of a person who had engaged in illegal "offensive conduct" when he entered the Los Angeles County courthouse wearing a

_____

different conclusions than this court).  Notably, *Silver Spurs* is unpublished, has been cited only once by the same court, and has not been cited by any other court.

jacket bearing a "plainly visible" expletive); *Loving v. Virginia*, 388 U.S. 1 (1967) (entertaining a challenge by an interracial couple convicted of violating the allegedly unconstitutional statute outlawing interracial marriages); *Freedman*, 380 U.S. at 61 (reversing a conviction under a state law requiring movies to be submitted to the state's board of censors).

An argument that one who violates the law may not subsequently challenge the legality of the law would turn our nation's body of constitutional law on its head and would encourage legislatures to enact vague laws.   Given the limitations imposed on facial challenges, a litigant who asserted a pre-enforcement challenge to a vague law would have difficulty establishing federal jurisdiction. *See*, *e.g.*, *Am. Charities for Reasonable Fundraising Regulation, Inc. v. Pinellas County*, 221 F.3d 1211, 1214 (11th Cir. 2000) (noting the need for plaintiffs to "demonstrate that a 'credible threat of an injury exists,' not just a speculative threat which would be insufficient for Article III purposes," quoting *Kirby v. Siegelman*, 195 F.3d 1285, 1290 (11th Cir. 1999)).

Applying the City's rationale, the litigant would also lack standing to challenge the law after it had been determined that her behavior had violated the law.   The fact that 48-91's prohibition on engaging in business without a license is unambiguous and clearly applicable to the plaintiff does not alter the landscape.   A person accused of violating the law does not lose standing to challenge the very law she is accused of violating.   In fact, status as a violator is often the precipitant of a "case or controversy" and the *sine qua non* of "actual injury".

Whether ATM has standing to mount a First Amendment challenge in the face of the City's alleged right to enforce the ordinance's proscription on engaging in business without a license presents a closer question.   The City's argument, however, faces at least two significant hurdles:

1.    48-91 does not specifically reserve unto the Council the power to deny a license to a business that has begun operating without a license, and the ordinance is readily susceptible to conflicting interpretations;[29] and

2.    as discussed in greater detail *infra*, the court has no satisfactory way to determine whether the Council's exercise of its alleged power was genuine or pretextual.  *See Cohen v. City of Daleville, Ala.*, 695 F. Supp. 1168, 1172-73 (M.D. Ala. 1988) (overturning the city's decision to revoke an adult oriented business license, noting that the license ordinance "has no provisions, explicit or implicit, for sentencing" and "in simple and direct terms, authorizes the city to put out of business those businesses used for illegal or immoral purposes").

The court need not decide the issue based on the denial alone, however, because ATM challenges not only the Council's denial of its license, but also the pre-denial operation of the ordinance itself.   ATM has presented sufficient evidence for the court to conclude (at least for a determination of standing) that operation of the ordinance impermissibly and indefinitely

---

[29]    As discussed *infra*, while 48-91 empowers the Council to deny a license for virtually any reason,  it does not specify denial as a punishment for operating a business without a license.

delayed ATM's ability to engage in activity presumptively protected by the First Amendment. *See Roaden v. Kentucky*, 413 U.S. at 504; *Gayety Theatres, Inc.*, 719 F.2d at 1552 (holding, in a case addressing the revocation of an adult theater's business license, that while the city could prevent the viewing of an obscene videotape, "it cannot constitutionally pierce the First Amendment shield and bar . . . presumptively protected expression based only on prior unprotected conduct"); *City of Daleville, Ala.*, 695 F. Supp. at 1171 . The City's contention to the contrary notwithstanding, such a delay constitutes a sufficiently concrete injury in fact to give ATM standing to challenge the ordinance to the extent it was applied,[30] and in the event of an outcome favoring ATM, its injury may be redressed.

### D.      Prior Restraint

The court has already determined that 48-91 is content neutral.   ATM also contends, however, that the application of the ordinance imposes a prior restraint upon its exercise of First Amendment rights (*i.e.*, the commerce of speech).   Thus, the court is faced with determining whether the ordinance also satisfies the requirements of content-neutral time, place and manner regulations.

The court is somewhat reluctant to label an ordinance imposing a licensing requirement - even one which singles out adult oriented businesses -   as a time, place or manner regulation.   Although aspects of 48-91 may regulate when, where or how business is

---

[30]      The court limits its focus to the City's information request and application of the challenged sections, 19C-21(j) and 19C-27.  (Doc. # 21).

conducted, the ordinance, as it is currently written and as it was applied to ATM, serves chiefly to regulate *whether* a person may conduct business.   In any case, courts continue to refer to such legislative enactments as time, place and manner regulations and, accordingly, apply the same analysis.  ***Riley v. Nat'l Fed'n of the Blind of N.C., Inc.***, 487 U.S. 781, 802 (1988) (characterizing North Carolina's fund raiser licensing requirement as a time, place or manner restriction); ***Zibtluda, LLC***, 2005 WL 1362711 at *7 (analogizing an adult business licensing requirement to adult business zoning restrictions, which ***City of Renton v. Playtime Theaters, Inc.***, 475 U.S. 41, 49 (1986) held were subject to "the standards applicable to content-neutral time, place, and manner regulations").

## 1.    Governing Case Law

The Supreme Court's decision in ***Thomas v. Chicago Park District***, 534 U.S. 316 (2002) controls the court's decision.[31]   The ***Thomas*** court addressed an ordinance "requiring

---

[31]     *Thomas*, a unanimous opinion written by Justice Scalia and unaccompanied by additional opinions, is a rarity in that regard within the relevant body of case law.  *Compare Thomas with Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774 (Breyer, J., delivering the opinion of the Court in which four other justices concurred.  Although none dissented, there was some splintering); *Nationalist Movement*, 505 U.S. 123 (Blackmun, J., delivering the opinion of a 5-4 Court with Scalia, J., joining the dissent); *FW/PBS, Inc.*, 493 U.S. 215 (O'Connor, J., announcing the judgment of the Court and delivering the opinion of the Court with respect to Parts I (six-justice majority), III (five-justice majority) and IV (six justice majority).  Three justices, Salia, J., among them, wrote separate opinions concurring in part and dissenting in part.); *Lakewood*, 486 U.S. 150 (Brennan, J., delivering the opinion of a 4-3 court, in which Scalia, J., joined in the majority); *Shuttlesworth*, 394 U.S. 147 (Stewart, J., delivering the opinion of the court.  Black, J., concurred in the result.  Harlan, J., entered a separate concurring opinion.  Marshall, J., took no part.); *Freedman*, 380 U.S. 51 (Brennan, J., delivering the opinion of the court.  Douglas, J., with Black, J., filed a concurring opinion).  The issues discussed in the cases

individuals to obtain a permit before conducting large-scale events" in a city park.  *Id*. at 317.

Specifically, the ordinance required a permit in order to "'conduct a public assembly, parade,

picnic, or other event involving more than fifty individuals,' or engage in an activity such as

'creat[ing] or emit[ting] any Amplified Sound." *Id.* at 318 (citing CHICAGO PARK DIST. CODE,

CH. VII, §§ C.3.A(1), C.3.A(6)).

Arguably, the activities mentioned in the Chicago ordinance, such as assemblies,

parades or events involving amplified sound, are more closely related to the First Amendment

than the activity regulated by 48-91.  The *Thomas* court held, however, that the  ordinance was

"not even directed to communicative activity as such, but rather to *all* activity conducted in a

public park" and was, thus, a "content-neutral time, place, and manner regulation."  *Id.* at 322.

> The picknicker and soccer player, no less than the political
> activist or parade marshal, must apply for a permit if the 50-
> person limit is to be exceeded.  And the object of the permit
> system (as plainly indicated by the permissible grounds for
> permit denial) is not to exclude communication of a particular
> content, but to coordinate multiple uses of limited space, to
> assure preservation of the park facilities, to prevent uses that are
> dangerous, unlawful, or impermissible under the Park District's
> rules, and to assure financial accountability for damage caused by
> the event.

*Id.*  Consequently, the Court held that the First Amendment did not require the ordinance to

include the specific procedural safeguards established in *Freedman* and subsequently applied,

to a lesser extent, in opinions addressing licensing schemes far more reflective of the

---

cited *supra* most closely reflect the issues in the case before the court.

ordinance addressed in *Lakewood* than the one before the court in the instant case. *See*

*Freedman*, 380 U.S. at 58-60 (requiring the censorship board statute to include the following

procedural safeguards: (1) limitation of restraint on expression while submission was under

review; (2) availability of expeditious judicial review; and (3) imposition upon the censor the

burdens of going to court to suppress speech and of proof in court); *see also*, *e.g.*, **FW/PBS,**

**Inc.**, 493 U.S. at 223-30 (distinguishing *Freedman* but requiring, in part of the opinion in

which only two other justices joined, an ordinance regulating sexually oriented businesses

primarily engaged in "purveying sexually explicit speech" to provide for a "specified and

reasonable time period during which the status quo is maintained" and within which the

licensing decision must be made and to ensure the "possibility of prompt judicial review in the

event that the license is erroneously denied");[32] *Redner v. Dean*, 29 F.3d 1495, 1499-1500

(11th Cir. 1994) (applying *FW/PBS, Inc.*).

     In spite of the exemption from *Freedman's* requirements, the Court recognized,

however, that prior restraints may materialize through the application of content-neutral,

standardless licensing regulations.

     Of course, even content-neutral time, place, and manner

---

[32]     Three other justices, Brennan, Marshall and Blackmun, concurring in the judgment, would
have required all three *Freedman* requirements. **FW/PBS, Inc.**, 493 U.S. at 238-39.
"[T]he holding of the Court may be viewed as that position taken by those [m]embers
who concurred in the judgmen[t] on the narrowest grounds." *Lakewood*, 486 U.S. at
764 n.9 (quoting **Marks v. United States**, 430 U.S. 188, 193 (1977)). Thus, *FW/PBS,
Inc.* unarguably requires analogous licensing schemes to include the two safeguards
discussed in Justice O'Connor's opinion. *See **Redner v. Dean**, 29 F.3d 1495, 1499-1500
(11th Cir. 1994).

> restrictions can be applied in such a manner as to stifle free
> expression. Where the licensing official enjoys unduly broad
> discretion in determining whether to grant or deny a permit, there
> is a risk that he will favor or disfavor speech based on its content.
> *See Forsyth County v. Nationalist Movement*, 505 U.S. 123 ...
> (1992). We have thus required that a time, place, and manner
> regulation contain adequate standards to guide the official's
> decision and render it subject to effective judicial review.
> *Niemotko* [*v. State of Maryland*], 340 U.S. 268,] 271 [(1951)].

*Thomas*, 534 U.S. at 323.

With that in mind, the Court upheld the ordinance because it found that

1.  the grounds on which the denial was based were "reasonably specific and

    objective, and do not leave the decision to the whim of the administrator"; and

2.  the ordinance provided "narrowly drawn, reasonable and definite standards" to

    guide the licensor's determination and that "are enforceable on review", first to

    an administrative body and then to the state courts.

*Id.* at 324 (quoting *Nationalist Movement*, 505 U.S. at 133 and *Niemotko*, 340 U.S. at 271.

Notably, the ordinance also required licensing decisions to be made within a specific,

relatively brief period of time, though the Court did not specifically address this issue. *Id.*

Finally, the Court addressed the plaintiff's claim that the ordinance provided too much

discretion because denial of a permit on one or any of the enumerated grounds was permissive.

*Id.* This fact was not enough to defeat the ordinance. *Id.* at 325.

> Granting waivers to favored speakers (or, more precisely, denying
> them to disfavored speakers) would of course be
> unconstitutional, but we think that this abuse must be dealt with
> if and when a pattern of unlawful favoritism appears, rather than
> by insisting upon a degree of rigidity that is found in few legal

> arrangements.   On petitioners' theory, every obscenity law, or every law placing limits upon political expenditures, contains a constitutional flaw, since it merely permits, but does not require, prosecution.   The prophylaxis achieved by insisting upon a rigid, no-waiver application of the ordinance requirements would be far outweighed, we think, by the accompanying senseless prohibition of speech (and of other activity in the park) by organizations that fail to meet the technical requirements of the ordinance but for one reason or another pose no risk of the evils that those requirements are designed to avoid.   On balance, we think the permissive nature of the ordinance furthers, rather than constricts, free speech.

*Id.*

*Thomas* therefore sets the standard for addressing "as applied" prior restraints on speech resulting from the administration of licensing legislation.[33]   *Contrast* ***Granite State Outdoor Advertising, Inc.***, 348 F.3d at 1281-82 (determining that a sign ordinance was content neutral and, consequently, governed by *Thomas*) *with* ***Solantic, LLC v. City of Neptune Beach***, No. 04-12758, 2005 WL 1262094, at *14 (11th Cir. May 31, 2005) (holding that ***Freedman***, and presumably ***FW/PBS, Inc.***, controlled the analysis of a sign ordinance the court considered content-based).   Because 48-91 is not, under ***Lakewood***, sufficiently related to speech or activity commonly associated with speech to be considered content-based, ***Thomas*** controls.

---

[33]   *Thomas* expressly left undisturbed the additional requirements for time, place and manner regulations, "under which the permit scheme 'must not be based on the content of the message, must be narrowly tailored to serve a significant government interest, and must leave open ample alternatives for communication.'" ***Thomas***, 534 U.S. at 323 n.3 (quoting ***Nationalist Movement***, 505 U.S. at 130).

### 2.      The Law of the Circuit

The Eleventh Circuit has had few opportunities to address *Thomas*.   *Solantic, LLC*,

2005 WL 1262094 at *14 (*supra*); *Burk*, 365 F.3d at 1254 (distinguishing *Thomas* on the

grounds that the ordinance addressed by the court was "directed only to communicative

activity, rather than to all activity, and its applicability turns solely on the subject matter of

what a speaker might say"); *Café Erotica of Fla., Inc.*, 360 F.3d at 1284 (addressing a sign

ordinance the court deemed content-based and relying, nevertheless, on *Thomas* to guide the

defendant in correcting the statute to include "content-neutral bases for which the County

Administrator may deny a permit"); *Granite State Outdoor Advertising, Inc.*, 351 F.3d at

1118 (citing *Thomas* for the propositions that time limits are not categorically required in a

content-neutral scheme and the risk that the City may demonstrate favoritism in its application

should "be dealt with if and when a pattern of unlawful favoritism appears"); *Granite State*

*Outdoor Advertising, Inc.*, 348 F.3d at 1281-82 (*supra* and discussed more fully *infra*); *Fly*

*Fish, Inc.*, 337 F.3d at 1314 n.25 (distinguishing the ordinance addressed in *Thomas* from one

specifically addressing adult entertainment businesses and noting that *Thomas* had not "altered

the *Freedman and FW/PBS* requirements for content-based licensing provisions targeting

adult entertainment establishments").    And, only the earlier *Granite State* case thoroughly

discussed and applied *Thomas*.

After holding that *Thomas* controlled its analysis, the *Granite State* court then sought

to   determine   whether   "the   ordinance   contains   adequate   standards   to   guide   official

decisionmaking".   348 F.3d at 1282.   The court upheld the ordinance and held that time limits

were not necessary under the circumstances.   *Id.*

> After all, City officials may not exercise unlimited discretion. They can only process permit applications based upon objective criteria set forth in the ordinance. [FN4] No official is able to reject an application simply because of the proposed content. Moreover, anyone adversely affected by the ordinance may resort to either administrative review or–as Granite has done–the courts.
>
> > FN4.   Consider, for instance, the case of someone wishing to erect a billboard.   If that person applies for a sign permit, the City can only deny the application based on specific, objective criteria–e.g., the proposed billboard is too close to the road, too large in size, too tall, located on a lot with other structures, or located on a lot not zoned commercial/industrial . . ..
>
> We realize City officials could potentially delay the processing of certain permit applications and thereby arbitrarily suppress disfavored speech.   We will not, however, address hypothetical constitutional violations in the abstract.   As the Supreme Court noted in ***Thomas***, we believe "abuse must be dealt with if and when a pattern of unlawful favoritism appears, rather than insisting upon a degree of rigidity that is found in few legal arrangements. [***Thomas***, 534 U.S.] at 325.   Furthermore, we are reluctant to invalidate an entire legitimately-enacted ordinance absent more of a showing it is as problematic as Granite claims. [FN5]
>
> > FN5.   In one short sentence, the district court termed permit delays a "serious issue" and referenced several news clippings attached to one of the affidavits.   The news clippings, however, simply explain that the Mayor of the City decided to improve permit-processing time.   Keeping

41

> ***Thomas'*s** admonition in mind about the need to avoid deciding hypothetical claims (and realizing that the district court did not have the benefit of an opinion from this Court addressing billboard cases post-**Thomas**), we note the Mayor's decision to improve administrative services does not necessarily mean a constitutional problem existed.

*Id.*

### 3.      48-91 As Prior Restraint

As discussed more fully ***infra*** the challenged provisions of Montgomery's business licensing ordinance constitute "as applied" prior restraints.  They are fraught with pitfalls and lack all of the redeeming qualities that allowed the courts to uphold the ordinances in ***Thomas*** and ***Granite State***. Although there is some evidence to suggest that the ultimate denial of the license was unrelated to the content of ATM's wares, application in this case of the provision establishing a community standards license smacks of censorship.  And a lack of standards guiding the City's decision and objective grounds limiting its discretion make it impossible for the Court to ascertain whether a denial stems from motives unrelated to the desire to limit pornography in Montgomery.

The risk of censorship is ever present.  Thus, while the City is not required as a matter of law to incorporate the specific procedural safeguards outlined in ***Freedman***, if the City chooses to continue regulating the issuance of business licenses through a facially content-neutral law of general application, the necessary reforms nonetheless must exceed those giving

comfort to the courts in **Thomas** and **Granite State**.  Specifically, not only will the City need to establish "reasonably specific and objective" grounds that limit the decision maker's ability to deny permits and ensure that the standards under which applications must be investigated and reviewed are "narrowly drawn, reasonable and definite", but it will also need to provide strict time limits beyond which the City may not restrain ATM's *expressive*[34] activities without providing a written, objectively-reasoned denial based on the grounds explicitly provided in the amended ordinance. **Thomas**, 534 U.S. at 324.[35]

       a.     *Section 19C-21(j)*[36]

This section, as stated above, sets forth the "license based on Community Standards

---

[34]    To the extent ATM's business does not include the sale of speech, the First Amendment does not apply, and the **Freedman/Thomas** requirements are likewise inapplicable.  The court offers no opinion as to whether the "lingerie" and "adult novelties" offered for sale (Doc. # 19, ¶ 4) constitute speech.

[35]    The court will not act as the City's legal advisor by prescribing a remedy that may or may not reflect the legislative body's goals and priorities.  **Burk** illustrates a number of possible approaches, each of which are consequentially distinct.  **Burk**, 365 F.3d at 1255.  The City could, "for example, target only offensive behavior or the manner of delivery of speech without regard to viewpoint or subject matter.  Or it could tailor its regulation more closely to fit expressive instances or conduct likely to threaten the harm it fears."  *Id.*   It could also continue with the approach it has taken.  That is, the City need not transform its ordinance into something other than a law of general application.  It need only reform the ordinance to guard against censorship by including measures designed to ensure commercial speakers that, as a law of general application, the business license ordinance is being applied as intended: generally.

[36]    Although the requirement that the City provide grounds for denial applies only to the ultimate licensing decision, the need for time limits as well as narrowly drawn, reasonable and definite standards to guide the implementation of the ordinance applies to every aspect highlighted by the court.

Criteria".    To the extent that application of this section delayed ATM's exercise of its right to speak, it was a prior restraint.   Although a requirement that ATM's license be approved by the Council instead of the Director is theoretically innocuous, the uncertainty and infinity of the delay in ATM's ability to exercise its constitutionally protected rights until the Council makes its decision intrudes upon the First Amendment.

Furthermore, the ordinance does not define "community standards criteria" or provide objective criteria by which the Director can determine whether a business qualifies. Consequently, it risks distinguishing, implicitly as written, and perhaps, explicitly as amended, businesses engaged in activity protected by the First Amendment, such as ATM.   The more distinctions the ordinance draws in that regard, the more likely the ordinance will be open to a facial attack and subject to *Freedman*'s requirements.

The line dividing cases governed by *Freedman* and those governed by *Thomas* is not clearly established.    The court finds it unlikely that section 19C-21(j) can be applied to speakers without crossing that line.   If the City aims to regulate the issuance of licenses to adult businesses differently, the law is well-settled that it may do so, and numerous examples of constitutionally acceptable ordinances exist throughout the case law.[37]

2.    *Section 19C-27*

This section is similar to 19C-21(j) in that the Director has standardless discretion,

---

[37]    It is important to note that a requirement that the City Council, as opposed to the Director, approve ATM's license based on objective criteria does not operate as a prior restraint.

unrestrained by time, to submit any application for Council approval. Compromised by the same deficiencies, it similarly violates ATM's First Amendment rights, as applied.[38]

In addition to those flaws, this section empowers the Director to investigate license applications but fails to set forth acceptable triggers to investigation, define the scope of the investigation, or identify the bases for referral to the Council. Absent these safeguards, the authority to investigate constitutes the authority to harass. Nothing in the ordinance prevents the Director or his or her agents from embarking on overly burdensome, intrusive, unending and repetitive investigations designed to stifle speech. This schema operates as a prior restraint in violation ATM's First Amendment rights.

Like the Director's investigation, the Council's decision making process is constitutionally inadequate. As prescribed by § 19C-27, no time limits exist, and the Council is empowered to deny any license "in order to either [sic] provide for the safety, preserve the health, promote the prosperity or improve the morals, order, comfort, and convenience of the inhabitants of the City." Although the Court offers no opinion regarding these standards as applied outside the First Amendment context, these grounds for denial    - especially since they

---

[38]    48-91 does not provide for a period of time during which a licensing decision must be made. The Director of Finance has the authority to investigate all applications, but the ordinance does not impose a time restraint on the investigation. § 19C-27. He may also refer the application to the City Council, but, again, he need not do so within a specified period of time. *Id.* The Council then determines, apparently at its leisure, whether to grant or deny the license. *Id.* Only if the Council denies the license must the applicant be notified, and the applicant then has the burden of responding with a written response requesting a hearing. *Id.* In that event, the city must hold a hearing within 15 days, but the Council may take as long as it wishes to make a decision. *Id.*

are informed only by happenstance -   impose far too great a risk of censorship.[39]

### c.     Additional Information

Upon applying for its license, ATM's principal was required to consent to a criminal

---

[39]     The ordinance has no recorded legislative history.  Thus, the Council's consideration of licenses after referral by the Director typically consist of hearings at which citizens appear on an ad hoc basis to contest or encourage the license.  Some of them may have vested interests in discouraging or encouraging licensure, e.g., some may be employees, competitors, owners of property as well as non-owners, or Montgomery residents and non-residents.  In sum, the City has no systematic means by which to gather or compile empirical information germane to the advisability of granting or denying a license.  This means, of course, that an applicant's fate could depend inordinately upon attendance at the Council meeting (by members or others) or the weather (if it keeps enough people away).  *Compare with **City of L.A. v. Alameda Books***, 535 U.S. 425 (2002), involving a challenge to a city ordinance prohibiting the establishment or maintenance of more than one adult entertainment business in the same building or structure.  The court held that the city could reasonably rely on a study it conducted some years before enacting the ordinance to demonstrate that its ban on multiple-use adult establishments served its interest in reducing crime.  The court set forth Los Angeles' findings:

> In 1977, the city of Los Angeles conducted a comprehensive study of adult establishments and concluded that concentrations of adult businesses are associated with higher rates of prostitution, robbery, assaults, and thefts in surrounding communities. See App. 35-162 (Los Angeles Dept. of City Planning, Study of the Effects of the Concentration of Adult Entertainment Establishments in the City of Los Angeles (City Plan Case No. 26475, City Council File No. 74-4521-S.3, June 1977)). Accordingly, the city enacted an ordinance prohibiting the establishment, substantial enlargement, or transfer of ownership of an adult arcade, bookstore, cabaret, motel, theater, or massage parlor or a place for sexual encounters within 1,000 feet of another such enterprise or within 500 feet of any religious institution, school, or public park. See Los Angeles Municipal Code § 12.70(C) (1978).

***City of L.A.,*** 535 U.S. at 530.

background check and to describe the content of the materials ATM aimed to sell by indicating either "hardcore" or "soft core" pornography.   (Doc. # 19, ¶ 23).   The City does not deny this and states that the information is necessary to ensure ATM's compliance with state law. (Doc. # 27, p. 13).   However, Alabama laws regarding obscenity do not require a criminal background check and impose no restrictions on a person's ability to operate an adult oriented business on the basis of a criminal history, other than to mandate revocation of   the relevant state license for   violating   the   state   licensing   requirements.     ALA.   CODE   §   13A-12-200.12   (2005). Moreover, the state obscenity laws do not draw distinctions between what some may consider "hardcore" or "soft core" pornography.   *See* ALA. CODE § 13A-12-200.1 (definitions).   Finally, while requiring the information may further government interests, the City has failed to identify any legitimate purpose for these requirements in this case.[40]

### D.      Unconstitutional Vagueness:  Due Process

ATM   also   argues   that   48-91   is   unconstitutionally   vague   because   it   does   not   define "community standards criteria", and the grounds on which the City may deny a license are limitless.    As ATM acknowledges, these are the "same subjective features" that render the ordinance unconstitutional, as applied, under the First Amendment.

ATM's overbreadth claim is by its nature a facial challenge, while vagueness challenges under the   Due   Process   Clause   of   the   Fourteenth   Amendment   attack   statutes     "as   applied".

---

[40]      The City also admits that it did not require ATM to apply for a special operating license under seciton 13A-12-200.12.  (Doc. # 19, ¶ 21).

*Contrast*, ***Virginia v. Hicks***, 539 U.S. 113, 124 (2003) ("Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating). Applications of [a statute] that violate the First Amendment can still be remedied through as-applied litigation, but the [court in this case] should not have used the 'strong medicine' of overbreadth to invalidate the entire . . . policy."); ***LAPD***, 528 U.S. at 39 (equating a facial First Amendment challenge to an "overbreadth" challenge); ***Renne v. Geary***, 501 U.S. 312, 324 (1991) (distinguishing between "overbreadth" and an "as applied" challenge); ***Bd. of Airport Comm'rs of the City of Los Angeles v. Jews for Jesus***, 482 U.S. 569, 574 (1987) (describing the "First Amendment overbreadth doctrine" to be a challenge to a statute "on its face"); ***T-Backs Club, Inc.***, 84 F. Supp. 2d at 1325 (citing ***Geaneas v. Willets***, 911 F.2d 579, 586 (11th Cir. 1990) for the proposition that "the overbreadth doctrine's 'application becomes more unlikely as the allegedly chilled expression moves from pure speech toward conduct . . ..'") *with*, *e.g.*, ***Maynard v. Cartwright***, 486 U.S. 356, 361 (1988) (due process vagueness challenge "is judged on on an as-applied basis). In essence, *Lakewood* established the standard for applying the overbreadth doctrine to licensing ordinances.

Because ATM has not asserted the deprivation of any fundamental rights unrelated to free speech and subject to due process protection, it is unnecessary for the court to discuss the vagueness argument beyond its previous discussion.

## F.   Relief

### 1.   Declaratory Judgment

> For a declaratory judgment to issue, there must be a dispute which "calls, not for an advisory opinion upon a hypothetical basis, but for an adjudication of present right upon established facts."

*Ashcroft v. Mattis*, 431 U.S. 171, 172 (1977) (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 242 (1937); *See also* *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

The Federal Declaratory Judgment Act, which permits federal courts to issue declaratory judgments in appropriate cases, provides that "in a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. See also FED. R. CIV. P. 57; *Fairchild v. Hughes*, 258 U.S. 126, 129 (1922); *Calderon v. Ashmus*, 523 U.S. 740, 745-746 (1998).

Because this case arises from a genuine controversy which requires the court to adjudicate the plaintiff's rights, it is appropriate for a declaratory judgment, and the court will issue one narrowly tailored to identify the specific statutory deficiencies and to define the parties' legal relations.

### 2.   Injunctive Relief

ATM has particularized its contentions regarding its entitlement to injunction relief:

> The court should . . . .  enter a permanent injunction restraining

Case 2:04-cv-00990-WC   Document 35   Filed 07/08/05   Page 50 of 53

> the City from enforcing the license requirement of Ordinance
> No.: [sic] 48-91 against the Plaintiff. This injunction should
> include a directive that Plaintiff be allowed to open and operate
> as a matter of right without obtaining the unconstitutional license.

Ordinarily, a declaration that a statute is unconstitutional on its face or as applied warrants

injunctive relief to protect the plaintiff against impermissive enforcement.   However, in the

instant case, the City has warranted that

> an injunction against the enforcement of [the] ordinance by [the]
> City against ATM would be unnecessary in the event the Court
> [declared] Ordinance 48-91 to be unconstitutional or otherwise
> invalid.

(Doc. # 23, p. 1).   Indeed, the City reiterates that "[r]egardless of the outcome, the Court need

not enter an injunction, because if ATM refiles its application,

> including the material filed on September 24, 2004 with
> certification that ATM has not engaged in business without a
> license since October 4, 2004, there will be no further
> impediment to the immediate issuance of the license for which
> it applied to operate as such business within the permitted
> operations and activities.

(Doc. # 23, p. 4).

The City's representations, taken literally, may obviate the need for the court's issuance

of an injunction to restrain enforcement of 48-91 or to compel the issuance of a license to

ATM to do business.   Although it is apparent that the City was willing to forego this litigation

if ATM had simply chosen to re-apply for a license, it is equally apparent that ATM  desired

a judicial ruling on its challenge to the constitutionality of the ordinance.

The Court will therefore issue an injunction limited to ATM's license and extend to the

City a structured opportunity to remedy the constitutional impairments of 48-91 for the benefit of future applicants.


### 3.    Other Relief

By filing a motion for "partial" summary judgment, addressing only the constitutionality of the ordinance, ATM reserved the issues of damages and attorney fees.   Accordingly, notwithstanding its ruling on the motions, as a matter of law, the court has scheduled further proceedings to conclude the parties' legal relationship.


## III.    CONCLUSION

The court's ruling today is designed to assess the extent to which Ordinance 48-91 complies with the mandate of the First Amendment and to afford to the plaintiff the opportunity to engage in protected activity unfettered by impermissible restraints.   Although the court has denied the facial challenge and has amply discussed why First Amendment interests are not central to "the rights of  all those to whom the statute might conceivably apply" for a business license in Montgomery, ATM has impliedly acted on behalf of itself and others.

To be sure, the potential evil of censorship and content based determinations were critical factors in the court's decision, but the ruling was driven by the need to protect the First Amendment rights of *all prospective applicants* from the unregulated opinions of the City's Director of Finance (whoever it may be).

The court is also mindful that Directors, City Council members, and mayors come and go; thus one Director, based on his personal philosophy, may be inclined to censor adult-oriented bookstores, while another may not.    In short, all of the community's values deserve protection, and the application of consistent standards in the investigation and decision making processes is, thus far, the most effective means of assuring that standards are applied    -    and that they are applied with equal force to everyone.

The City now has the opportunity    - and hopefully the impetus -    to enact measured amendments to 48-91 to imbue the ordinance with neutral criteria and transform it into a regulatory scheme that is immune from constitutional challenge.   The court urges it to do so.

To redress, in part, the injury which precipitated this litigation, however, and to establish the parties' legal relations hereafter, it is hereby ADJUDGED, ORDERED, and DECREED as follows:

1.  ATM's Motion For Partial Summary Judgment is GRANTED in part and DENIED in part.

    a.  To the extent that the motion challenges the constitutionality of 48-91 on its face, the motion is DENIED.

    b.  To the extent that the motion challenges the constitutionality of 48-91 as applied, the motion is GRANTED.

    c.  To the extent that the motion challenges 48-91 as an unconstitutional prior restraint on the exercise of First Amendment rights, it is GRANTED.

52

2.       The City's Motion For Summary Judgment is DENIED.

3.       An appropriate judgment and injunction will be entered.

DONE this 8th day of July, 2005.


/s/ Vanzetta Penn McPherson
VANZETTA PENN MCPHERSON
UNITED STATES MAGISTRATE JUDGE